Saba Capital Master Fund v. BlackRock ESG Capital Saba Capital Master Fund, LTD. v. ClearBridge Energy Midstream Opportunity Fund, LTD. Good morning, Your Honor. Tariq Mandir for the BlackRock Appellants. I will be addressing the substantive issues under Section 18I of the Investment Company Act. My friend, Mr. Joyce, will be addressing the serious questions of standing, and Mr. Cousett will be addressing the jurisdictional issues. Before I begin, Your Honor, I would like to thank the Court for hearing us on an expedited basis. We do have an emergency here in the sense that we have a shareholder vote that's coming up in the summertime, and the imminence of a Saba takeover of a Maryland fund, I think, you know, is the reason that we moved for expeditions, so we thank the Court for doing that. This appeal really involves the imminent prospect of Saba using its 25% controlling position to take over a Maryland incorporated fund. The issue is whether, despite the requirements of Maryland's anti-takeover laws, which are designed to protect Maryland entities from the very conduct that Saba is engaged in, whether that type of conduct is prohibited by federal law. We say not. The text of Section 18I doesn't support it, the plain meaning of Section 18I doesn't support it, and the overarching preemption jurisprudence does not support it. I mean, well, you say required by Maryland law, but obviously, you know, Maryland law has a carve-out for a corporation registered under the ICA as a closed-end investment company, and the default is that it doesn't apply. You have to opt into it, right? Well, you can opt into the statute, which is what this fund did, but the fact that they voluntarily opt into the statute doesn't mean that the features embedded in Maryland law are not otherwise required. So if they opt in, it's required, but you don't have to opt in. So why is that the plain meaning of required? Well, there's nothing in the statute that suggests that a voluntary decision to opt in has to be required. There is something in the statute that says the word required. Right, but the features of Maryland law that apply to controlled shares here are required by Maryland law. The fact that it's voluntary at some point in the chain of events doesn't mean it's any less required. People make voluntary decisions all the time. You can voluntarily enter into contracts, but you are bound by the obligations therein. You can add employees that then result in legal requirements. There's all sorts of things that you can do on a voluntary basis, but once you do that, which is what happened here, those are requirements of the Maryland law, unlike Nuveen. The other thing that I— The Maryland law doesn't say that it's irrevocable and it's for all time. So even if I embrace this argument, which I'm not sure I do, that if you make a decision at time one, it becomes a requirement, the Maryland law requires you to opt in, allows you to opt in and end up there, right? It does, but in the exercise of your fiduciary duties, and that is a requirement. But that's not the issue in this case. The issue in this case is did the fiduciary duties require them to opt in, and they made a determination in the Maryland law, yes, our fiduciary duties require us to opt in because— But that's a different argument. You're saying Maryland law requires it because the funds here determine that it's—because their fiduciary duties require them to opt in. Yeah, but I mean obviously if you determine that your fiduciary duties require you to do something that's unlawful, you can't do it, right? For sure. So that just begs the question, doesn't it? For sure, but here I think we have two arguments. One is that you've got the voluntary decision, but you also have the textual reason. Their reasoning would read out the word otherwise. If you look at Section 18A, which is the intro to Section 18I, it makes it very clear that except as provided in Section 18A, or otherwise provided by law, if you look at Section 18A, which has to be read in the context of 18I, there you do have a voluntary submission. You voluntarily issue senior securities, and that's true. Well, that's true. I mean there's particular circumstances where you're raising money for the fund. But why does that read out the word otherwise? So 18I says except as provided in Subsection A of this section or as otherwise required by law. So except as provided in Subsection A with these two options you have under that subsection, or aside from that, which is what otherwise means, what's required by law, right? Otherwise may mean a couple of things. It could mean in the same vein as. So look at 18I with the same- Well, it's in the same vein as because it's an exception to the general rule of Subsection I. Or you could say in other ways like. And if you look at 18A, 18A is very clear. You can issue senior securities. You're focused on this arguable reading of the word otherwise, but I'm more struck by the difference between provided in Subsection A and required by law. I mean shouldn't we give meaning to that distinction as well? Not particularly because I don't think it would make any difference here as to whether the use of provided or required. So even though otherwise has multiple definitions, you're saying we have to adopt yours, but even though Congress is using two different words, we should treat them as basically equivalent. I think what we're saying is that on either interpretation of otherwise, it doesn't exclude voluntary acts. That's the first point. The second point is whether the word provided or required is used would make a difference to our argument. What they are saying is that otherwise must exclude, must exclude voluntary acts. And there's nothing in the statute that supports that. I think the argument is that required excludes voluntary acts. So if we're not focused on otherwise, we're focused on required. Does that make a difference? Is it required today? Is it required presently? That's the analysis. Okay. I think we have that argument. You've reserved some time for rebuttal, so we'll hear from you. Again, we'll turn to the next appellate, Mr. Joyce. Good morning. Judge Menasche, Judge Lee, and may it please the Court, I'm Eamon Joyce on behalf of Roy's Global Value Trust. Plaintiff's claim against Roy should have been dismissed for lack of Article III standing. Plaintiff's assertion that it will experience future injury as to Roy's shares is wildly speculative. It has no resemblance to the circumstances. In Nuveen, and that's where I'd like to start, right? for why it was finding imminent harm. None of them apply here. It says, SABA established, one, a pattern of increasing its ownership in Nuveen funds for over a two-year period before the amendment. Here, you don't have either of those things. Stagnant ownership, all ownership, post-amendment. Two, intend to purchase additional shares but for the amendment. Those aren't magic words, which is what the district court seemed to take them as. When you read down in Nuveen at pages 112 and 113, the court's reasoning shows why it could credit the declaration and pleadings and why nothing like that is here. It said, SABA bought millions of shares in Nuveen's funds from 2018 to 2020 at levels high enough to trigger the amendment. So you're saying in Nuveen it's much more plausible that they're going to buy additional shares, whereas here it's more like someday intentions? Someday intentions, I think that's right. Even if they're buying up shares of these funds, it does seem like that is generally their MO, isn't it? So their MO is generally to buy shares of funds that they consider underperforming. They don't, I think if you look at their declaration. Where would it matter, right? So I understand in Nuveen we have this 9.9% threshold, and that's pretty dramatic, and maybe it makes it more clear. But certainly if you only own a little bit, if you think that your voting rights are not going to be honored, you might not buy, even go from 2% to 3%. So if you're deterred from buying anything more because your ultimate objective would always be to reach 10% because that's your strategy, then why isn't it that you are chilled or deterred even from buying more when you're at a low percentage? Let me make sure I understand your honors question. Are you asking specifically whether deterrence is present injury, or are you asking it through the lens of imminent? I think if we're in present injury. It's either one. So you have a present injury because you want to buy more, but you're not going to pursue this company if it's not going to honor your voting shares. But if you knew that it would, maybe you'd buy up a lot more quickly. So it could be a present injury, or it could be an imminent injury. So in present injury, I'd say the district court didn't go there. I think it'd have to go back down on present injury out of the gate. So I don't think that interest is concrete. I think we've laid out some cases why a desire to do something is not deemed sufficiently concrete. Here, it also wouldn't be particularized as to Royce, especially given the history we have. And then I think to your honors point about which is almost like spotting them imminent. I don't think it works under Lujan, which put a lot of focus on the when. I think when you're on our considered Lujan put a lot of focus on whether it was going to happen or not going to happen, right? And so in Lujan, they just said, I like seeing the animals, and I plan to do so someday. So here, they actually have bought some shares. But we have a history of buying up a lot of shares and reaching 10%. And so it seems more plausible or less like someday intentions than Lujan. I'm not sure it does. I'm not sure it does, Judge Menashe. And let me say this, right? They plead themselves. It often takes them months or years to build a position, right? It was two years in Nuveen to build that position. That looks like someday intentions. When you come in between, is that cut? So if it is a long term strategy, doesn't that mean you have to plan early on? And so it might frustrate the strategy, even if you're at an earlier point. No, Your Honor. I think it actually gets worse for them, right? If you look at the circumstances here, just take the three funds that challenge standing. To get to 10% on those three funds is roughly $165 million expenditure. But of course, their declaration doesn't say that. They say they're going to get to 10% of everything. It's $300 million that they're saying they're going to put out out of pocket over a period of years. And then we all know that things can change over the course of years. And I take your— If we knew that 9.9% is enough and that could show evidence and 2% is too little, where would we draw the—what's the principle that we're applying? So I don't—let me push back on 2% not—categorically not being enough. I think it's the facts that matter, right? If you had a holder at 2% that said—similar to the situation my friends at BlackRock find themselves in. If you had a holder at 2% that said, this company is being, in our view, badly mismanaged. We want to effect a change in ownership. We would go to 40% tomorrow, right? You have a declaration that says we have allotted funds to get ourselves to 40% or, frankly, to 10.1%. That's what we want to do. Then I think it's a very different case. Your Honor, it doesn't have that— If you have a claim where they're looking at a universe of funds and they're deciding which ones to invest in to go up to 10%, you're saying they don't—they can't actually bring this kind of claim unless they actually pick one that they're going to do and intend specifically there to do 10%. They can't just say we're deterred from all of them because of this problem and so we can't implement our strategy. I just think the line drawing on the other side, it becomes impossible, Your Honor. Twenty-five states have control share provisions. Saba has a lot of money. Is every company in every one of these 25 states that has a control share provision potentially a defendant because Saba says maybe I'd invest, I've invested 10% in other funds? I just don't see it— In terms of the reality, it makes sense that they would just be thinking about which one to invest in and this issue might make a difference. And so if they in fact did just pick one to invest in, you know, maybe even for the purpose of challenging the control share provision, it seems like that's a requirement that they spend a lot of resources on one thing where they don't actually know whether they can invest or not. But, Your Honor, I'm not saying they have to—I'm not saying they have to spend the resources. I think—and look, Lujan doesn't require the plaintiff to have the planning ticket. They said, here's this one fund, and if we—and we intend to go to 10% tomorrow if the limitation on voting was not there, they would then have standing. I think you might require—tomorrow gets you a lot closer, right? That's the when. I think if you look at cases like this court's case in Calcano, right, applying Lujan in those cases, that's a case where all the plaintiff had to buy was a single gift card, and the plaintiff was saying, I would do this immediately, and said, I live in the Bronx. I'd go down to Columbus Circle to buy the gift card. And this court said immediately it wasn't good enough there, that more detail was needed to make that claim plausible. Here you're talking about the expenditure of millions of dollars. So I think saying, we intend to spend millions, really, if you put it together with her declaration, $300 million. Maybe it's not plausible that you or I are going to spend millions in an imminent time period, but it's not so implausible for a large fund, right? So, but this is, Your Honor, where I think it moves together with the year's position. Because, you know— Right, so they have said that it's a long-term strategy. It's a long-term strategy. They plead that it's under current market conditions. Today, as we sit here, Royce is up 20% in a one-year period. It's up 9%. I mean, this isn't a suicide pact, Your Honor. Given Saba's investment strategies, I would hope that if Royce is up another 20%, that Saba's plan is not to change ownership of Royce. And this is where—and stepping back, right? They haven't pleaded as to Royce, unlike as to BlackRock, what they intend to do. But this just becomes one speculative condition on another. We don't know what's going to happen in the months that follow, let alone in the years that follow, while they may or may not accumulate a position. Thank you for your indulgence. We have that argument, and we'll turn it to the next appellant, Mr. Cousett. Cousett? Cousett, Your Honor. Good morning, Your Honors. May it please the Court. Brian Cousett for K&L Gates LLP on behalf of the Adams Fund's defendants, addressing the jurisdictional issues, and my co-counsel, Stuart Webb, representing the Tortoise Funds from Venable, will be addressing those issues on rebuttal. The district court found that the Adams and Tortoise Funds transact business under the 40 Act and were subject to jurisdiction under CPLR 302A1 based on two pieces of record evidence, that our clients list their stock on the stock exchange and that they use brokers who may have offices in New York or may be based in New York. That's it. The district court didn't cite any case with analogous or comparable facts to support its holding on that point, nor does SABA cite any in its opposition brief dealing with comparable facts. Looking at the case law, this isn't enough, either to transact business under the 40 Act or the other statutes that apply that test or under CPLR 302A1. Look at the cases under transacts business. The Supreme Court in Kodak said twice in its decision that Kodak was engaged in a continuous course of business in the Atlanta area. Therefore, they were transacting business in the northern district of Georgia. In Skofany, the Supreme Court said multiple times in its decision that the British parent was engaged in continuing intensive activities. What do you use brokers in New York to do? Well, there's very little in the record evidence on that in this case, Your Honor. For my clients, the Adams Funds, we noted that we make payments to certain businesses based in New York. One of them was Bloomberg for a Bloomberg subscription and to certain brokers who are headquartered in New York. Do you have a broker in New York to pay your Bloomberg subscription? No, Your Honor, no. Those are two different points. Oh, it's a separate thing. You have brokers in New York. Are the ones in New York the ones that sell shares that SABA might be purchasing? No, Your Honor. I think that's an important— If SABA purchases the shares, who is it transacting with? That's a great question, Your Honor, and I believe that's a question for Mr. Musico. There's no evidence in the record as to where any brokers are— Okay, but when you're going to sell shares to somebody who's buying them, where is that person located who's selling the shares? Well, these are closed-end funds, Your Honor. So the shares were put up—my clients have been listed on the Stock Exchange since 1867 and 1930. And the shares have been traded on the Stock Exchange. When SABA went and bought its shares of my clients, they didn't buy them from us. They bought them from third parties on the market. We don't know who they bought them from, so we have no—there's nothing in the record on that. And that's what's so problematic about the district court's decision. Essentially, it's saying if you list on the Stock Exchange and you have separately, not to do with the actual dispute, but just your business uses brokers who may have offices in New York, that's enough either to transact business, even though the case law says otherwise. If a purchase happens on the exchange with a third party, haven't you decided to put your shares out for a purchase in that kind of arrangement? It's certainly true, Your Honor, that our clients chose to list on the Stock Exchange. At least as to my clients, that decision was made before the Forty Act was even passed. Whether or not that's enough to subject a company to jurisdiction, the test under the Transacts Business Test is whether it's everyday business of a substantial character. That's what the Supreme Court said in Kodak and Skofany, and that's not present as to listing on the Stock Exchange. And if you look at the Southern District's decision— That list looks like many appellants, but are you making an argument about both personal jurisdiction and venue, or you're focused only on venue? Great question, Your Honor. It's linked in this particular instance. Under the Forty Act— I guess because I was going to ask about what the district court said about nationwide service of process. Yes, that— Maybe you could address that point. Sure, absolutely, Your Honor. If you look at the jurisdictional provision in the Forty Act, it's substantially identical to the provision in 15 U.S.C. 22 in the Clayton Act. Both of them identify venues where a case can be brought, and then both say, and process in such cases may be served, and then it provides for nationwide service. So we're not challenging that the Forty Act says nationwide service is available, but under this court's decision in Daniel, interpreting the Clayton Act, which again is substantially identical, nationwide service is only available in such cases, and this court in Daniel interpreted that to mean in such venued cases, where there is a—where the case is brought in one of the venues specified here in the Forty Act— So the case couldn't be brought here both because you don't transact business in New York for purposes of the Act and because you haven't availed yourself of New York? That's right, Your Honor. Once you get past the venue issue, if we don't transact business here, the only thing they can rely on to establish personal jurisdiction is our New York contacts. And again, the only New York contacts in the record for my clients are at Joint Appendix 376 and for Mr. Webb's client at 372 to 373. It's very meager contacts, Your Honor, and this court has repeatedly held, at least in the context of New York law and the CPLR, that companies have substantial latitude to list on the stock exchange without subjecting themselves to New York jurisdiction. And the district court's decision basically overlooked that in favor of throwing us in with everyone else. I see— Thank you very much, Mr. Costa. We'll turn to the last comment. Yes, thank you, Your Honor. No, we have one more comment. No, we don't? Oh, he's only doing the rebuttal. Okay, there's three. All right. We'll turn to the affiliate, Mr. Musico. May it please the Court. Thank you, Your Honors. Mark Musico on behalf of SABA. Your Honors, the district court properly concluded that the result in this case is in every material respect controlled by Judge Wedgley and Judge Parks' well-reasoned decision in Nuveen just last year. SABA's target in this case is exactly the same target that was at issue in Nuveen. Wait, sorry. Just give me one second. The time is not counting down. I just wanted to— Okay. Let's try that again. Okay, go ahead. Thank you, Your Honor. SABA's target in this case is exactly the same target as it was in Nuveen. Resolutions in the funds governing documents voluntarily adopted that discriminate with respect to shareholders' voting rights in exactly the manner that this Court found— I get that. We didn't have this provision, or there wasn't a focus on this provision otherwise required by law. I mean, you recognize that that is an exception. Yes, Your Honor. So if Maryland did require them to have the control share provisions, you would say that it's exempt? And we would submit, Your Honor, that there is no reasonable construction of the Maryland Control Share Act that requires these funds to impose control share provisions or to otherwise discriminate with respect to voting rights such that they can benefit from the control share provisions. Why does that matter? So under Section A of the statute, you know, there's no provision that requires them to issue securities as collateral for debt or do the preferred shares that's allowed under subsection A. But if they do, you know, the law specifies how you do it. So why doesn't the Maryland law work the same way? So, Your Honor, the Maryland law is fundamentally different from the provisions of Section 18A. Defendants' whole argument is that once you make the voluntary choice to opt in, they are somehow required to do something under Maryland law. But defendants also implore the Court to actually examine the control share provisions themselves, which we hope the Court will do because they belie defendants' own argument. If you look at ECAT's own declaration, which is at page 539 of the joint appendix, even after opting in to the Control Share Act, ECAT's declaration includes a provision that authorizes its board to exempt any transaction whatsoever from the operation of the act, so much for anything being required once they're opted in. The provision of the Maryland law in subsection A1 says holders of control shares of the corporation acquired under the Control Share Act admission have no voting rights with respect to the control shares except the extent approved by the stockholders at a meeting held under 3704 of this subtitle by the affirmative vote of two-thirds of all the votes. So you're saying because they can come up with whatever arrangement they want for limiting the voting rights, then there's no requirement to Maryland law. There is still no requirement. You do have to do these particular things, right? You have to have a two-thirds vote and you have to have a meeting under 3704, right? No, Your Honor. These funds can still— You don't even have to do that? No, they can modify these provisions in any way they see fit. Again, if you continue to look at the resolutions adopted by these funds, ECAT's declaration in particular goes on. It exempts preferred shares from the operation of the Control Share Act. Other funds— Well, that would be except to the extent approved by the stockholders. But does something in the declarations tell me they did not, in fact, have a meeting held under Section 3704 of the subtitle by the affirmative vote of two-thirds? No, Your Honor. These are completely independent, adopted before any particular transactions were at issue. So there was not even an opportunity for a shareholder vote. ECAT, in particular, as we've noted, is egregious because ECAT was exempted from the operation of the control share statute altogether when it opted in. At the time, Maryland's law only applied to corporations. But ECAT, of course, is a statutory trust. And that's why, as you see in ECAT's declaration, it has to include language that the Control Share Act was adopted, quote, to the same extent as if the trust were a Maryland corporation. ECAT then tries to rely on a later amendment to the Maryland statute in 2023, which allows statutory trusts formed after 2023 to opt in. But, again, the key language there says such trusts may adopt control share provisions. And this is where defendants want up to be down and in to be out. They want may to mean shall. Unless Maryland tells them that they must have control share provisions, then exactly how it is, it's never going to be required by law. I'm sorry, Your Honor, I couldn't hear you. So unless Maryland tells the funds that they must have control share provisions and also provides exactly what those provisions dictate, it's always going to be required. It's never going to be required by law. Your Honor, we likely would take that position, but there may be – What if Maryland law required control share provisions but didn't specify the nature of them? If there was – So then, I mean, if we think that the ICA prohibits control share provisions, that if Maryland required some kind of control share provisions, you wouldn't have a basis for saying, well, it needs to be more permissive than you've chosen, right? At that point, Maryland law would have required something consistent with the ICA, and that would be enough. I think we would agree in that circumstance, Your Honor, that there is an actual requirement. We still would make the argument that Section 18I's proviso is best read to apply only to other requirements of federal law. And that, to some extent, flows directly from – Your Honor, you think it's only required – it's only federal law? And I'm sorry. It's only requirements of federal law? I mean, in 1940, when it was adopted, I mean, weren't most of the laws governing, you know, corporate form, state law? So, Your Honor, this flows from a number of different sources of the text of the ICA. For one thing, there are plenty of provisions where Congress specified state law specifically was carved out. It flows directly from defendants' arguments about, quote, otherwise required by law. If otherwise really means similar to Section 18A, why doesn't it also mean similar to Section 18A? Well, come on. You think that otherwise just means different from. It doesn't mean that it has to be exactly the same as subsection A. I'm just saying – That's not your argument for the other issue. But taking defendants' own argument, Your Honor, I'm saying if otherwise means similar, it should mean similar not only in structure but also with respect to applying only to federal law. And, again, Your Honors don't need to decide this issue for purposes of this appeal, but let me give you a hypothetical to demonstrate this point. If a state came in and said no shareholders of closed-end funds shall be allowed to vote, that starts to look a lot less like room for traditional state corporate regulation and a lot more like nullification of federal law. It just can't possibly be what Congress intended. Your Honors, I also will – I have to emphasize that Section 18A operates fundamentally differently from the Controlled Share Act. Section 18A says you cannot issue preferred shares unless you meet certain conditions. I understand. Subsection A is about bringing new money into the fund in ways that don't entrench the board. Is that the point you're going to make? Even on the terms of whether it's an actual requirement, Your Honors. So if you look, by contrast, at the Maryland Statute, Section 3-702C, Section C, the Maryland Statute exempts closed-end funds registered under the Act unless they opt in, meaning in 18A you have the provision no preferred shares unless you meet certain conditions, which defendants say are requirements. Under the Maryland Act, it says no Controlled Share Act. So if the defendants here were covered by Subsection A of the Maryland Act so that they had to opt out, you're saying that it would be required by law? Your Honors, again, you don't need to decide that question for purposes of this appeal. Because it's an opt-in. But no, Your Honors. We still would take the position that the funds are under no requirements in that circumstance is because Maryland still gives them complete liberty to comply with federal law, and we believe that's the most reasonable construction of the proviso. Before you run out of time, we talked about the standing and the jurisdiction question. Yes, Your Honors. So what about the standing? Isn't it just someday intentions that you're going to ever reach 10 percent ownership in these funds? It is not, Your Honor. And I couldn't agree more with my friend, Mr. Joyce, when he said it's the facts that matter. And Saba's standing here is premised on far more than a boilerplate allegation of someday intentions. But isn't it premised on a bit less than what was present in Nuveen? Because the one thing that sticks out in my mind is that in that case, we did say that there were – well, in ruling that they were standing, we did look to the three factors of, you know, how automatic the effect of the provision is, and the stated intention of buying more, and an increasing pattern of purchasing shares. That was one of the three factors. And so in Nuveen, you had this two-year period of steadily increasing amounts of shares. Here, I mean, for some of these entities, maybe that's present, but it feels like there's just, okay, here are all these companies, and we've got shares of all of them. Some it's 2 percent, some it's 9, some it's 10. There's no showing of a pattern. And so the idea that there is standing for all of them when, as you started out by saying, it is kind of a fact-based – you look at the individuals, and it seems like what you have here is you have this declaration. But then across these different entities, it's – I don't necessarily think they are all the same. So, Your Honor, I agree. And the district court was clear-eyed about the fact that Saba's – I think its phrasing was, the imminence of Saba's injury was not as apparent with respect to certain funds as it was with respect to its investments in Nuveen. But respectfully, I would submit that all of the components that supported Saba's standing in Nuveen are also present here. First and foremost, the one that defendants never grapple with, not in their briefs, not in Mr. Joyce's argument today, are their own concessions about Saba's intentions. Nuveen called this an implicit concession. To me, that idea that they have a view of what Saba is and does, that, okay, this is what they do. They go up and they try to buy up all these companies. That still does not establish that, okay, with regard to this set of 16 or whatever the number is, that they've shown enough that, you know what, if this provision weren't in effect, we would, in fact, go out. I mean, we have this declaration that says we'd like to do this. And so I do wonder what is the limiting principle here. If all it requires is that you have a reputation for being that kind of company and that you purchase a share and say, I want to get more, how, what is the limiting principle? Respectfully, Your Honor, it's not just a reputation. It is, as Nuveen put it, this Court Nuveen put it, a demonstrated track record. Aren't there differences even in terms of how easily that can be done with regard to different funds, correct? It's not as if you can just, it can be more difficult. You have a demonstrated track record of buying up lots of funds, but you don't have standing to sue every fund in the country on the theory that sometime in the next hundred years you're going to buy 10 percent in ownership stake in them, right? Your Honor, I think I would agree with that, but, again, you have to take You think you would agree with that? Well, again, this goes to a point where there are only so many closed-end funds in the country. It's actually a relatively finite number. Oh, you're saying because the MO is specific to closed-end funds, we are going to go after all of them in the country. Is that your argument for all of them? So just so the Court is aware, for context, there are only about 400 closed-end funds in the country. Only 400? So you only have standing to sue 400 funds right now because of your track record. So, Your Honor, in addition to actually having to make an investment in certain of those funds and for SAVA's portfolio manager to be able to testify under If you make one investment and you have like a 2 percent stake, why is that enough to say it's imminent that you're going to be deprived of voting rights if the voting rights limitation doesn't kick in until you reach 10 percent? And by your own admission, reaching 10 percent might take years. So a number of reasons, Your Honor, and it to some extent goes to the deterrence point you were discussing with Mr. Joyce before. Mr. Joyce came up here and said this would be a different case if we came in and said we would go to 40 percent tomorrow. But, of course, as Mr. Joyce has to admit, we can't. This is a long-term process. And so in addition to having the track record Well, when I made that suggestion to Mr. Joyce, he said the District Court didn't rely on that. And if we do think that there's some kind of present deterrence from pursuing your investments, it would have to go back to the District Court. Is that right? This court can, of course, affirm on any grounds that are apparent in the record, and we have cited numerous cases where But is that your argument? It's not that there's an imminent risk of being subject I mean, you're allowed to make alternative arguments, which probably that's what you'll say, but these are two separate arguments, which is there's either an imminent risk that you're going to be subjected to the voting rights limitation or there's a present injury that you're deterred from pursuing investments in these funds. You're absolutely right, Your Honor. Do you think that they are both things? We do believe there are both things. We believe imminence is established in the same manner as Nuveen, given defendant's concessions, given Saba's track record with respect to investments in closing funds. And again, Nuveen Being presently deterred, I mean, usually that's in the First Amendment context where somebody's deterred from speaking. And we don't just sort of say that they're deterred from speaking on any kind of subject that might occur to them. It's usually because they have a track record and they want to say a particular thing. So that's going to be penalized. So, I mean, you can't be deterred from investing in all 400 funds, can you? What's the limiting principle there? So again, Your Honor, we do Saba's portfolio manager has testified under oath about Saba's intentions with respect to these funds. If he couldn't testify to those things honestly, he wouldn't do it, right? I think you're saying that your position is you pursue these long-term investment strategies and if your voting rights aren't going to be respected, you have to take this investment off the table and that prevents you from engaging in a transaction you otherwise might or would engage in. And the testimony in this case, Your Honor, is Well, that was a question. I mean, isn't it accurate to say you might engage in it? We don't know for sure that you're going to go to 10 percent in all of these funds, right? The under oath testimony credited by the district court is that Saba would with respect to these funds. But then I do have to make the other These funds that, who are the defendants? Who are the defendants, exactly. There's a sworn declaration as to each fund named as a defendant. If we're talking about some That they are capable of getting to 10 percent in each fund. And I'm sorry, I couldn't hear you, Judge. I'm sorry. That Saba would and is capable of getting to 10 percent in all of these funds. Absolutely. And as you say that, Your Honor, it reminds me, Judge Menasci, of your concurrence in the FSSRP case. Saba is absolutely ready and able to take the steps to participate in this process, To buy the shares, which will trigger the discriminatory provisions. And you've said that, though. Was that in the record below? I guess that's my other concern. We have the declaration saying what Saba's intentions are. But some of these other issues, particularly with regard to the companies where it's a very small number of shares And it's hard to obtain additional shares, as you acknowledge. Nonetheless, you want to do it. You've said you've done it. That should be enough to give you standing? Mr. Kazarian's declaration, Your Honor, is unequivocal about this. He says Saba would. It's paragraph 27 of his declaration. It was attached to the complaint. It was attached to the motion for summary judgment. With respect to these funds, he has testified to that under oath. I also have to make— We'll get to the jurisdiction. It's okay. We have questions, and you'll stay as long as we do. But I appreciate your reading my separate opinion. But in the affirmative action cases, the injury is the denial of the equal opportunity to compete in a fair process, that there's discrimination. And if you were to extend it to this context, you're basically saying anybody who engages in transactions in this market has suffered an injury because the looming threat of control shares out there makes the whole market unfair. Is that your argument? So let me say it's not our primary argument. But, Your Honor, here is where, again, it's important to consider the totality of the record. This is not about anyone in the universe who buys a single share in any given fund, and it's the first time they've ever done it, and they just state they have no demonstrated resources. They have no track record. They just come in. They buy a share. They try to sue. That is not our record. We have Saba sworn testimony under oath. We have a track record of accumulating significant stakes in closed-end funds. But this idea of the reputation in your track record, if someone came along, a billionaire who has no experience, has not previously engaged in this, buys shares in some closed-end funds, so if it's not the David saying, I absolutely intend to buy more and I'm deterred from this, they don't have the reputation, they haven't done it before, do they have standing? It would be a much more difficult case, Your Honor. And that's why it is Saba's. And this is exactly what the court held in Nuveen at 88F4, at 111 and 112 Note 6. The court looked both at Saba's investments as to other Nuveen funds where Saba had accumulated greater than 10 percent, and it looked to Saba's activity with respect to non-Nuveen closed-end funds where Saba had accumulated greater than 10 percent. And so that historical track record is certainly important and a key piece of the standing analysis here because it's what confirms for the court that there are more than just some day intentions or speculations here. It makes it concrete. We should find it plausible that Saba will buy 10 percent ownership stake in all of these funds. The testimony, Your Honor, that Mr. Kuzarian gave is that given market conditions at the time he swore to his declaration, Saba would if these control shares – Isn't that pre-qualification? So if, in fact, your strategy takes years and you're saying if current market conditions hold, we will eventually have 10 percent, I mean, it doesn't seem like it's not – I can't be confident that you actually are going to own 10 percent of these – Your Honor, the same might have been true while Saba was waiting for the control share provision dispute to be resolved in Nuveen. Because market conditions might have changed. Exactly. And that's exactly – Your Honor, if I could just make one last point because I want to make sure to make it clear. The Nuveen court said one last thing that's important to the standing analysis here as to current injury. And Nuveen recognized that an interference with the shareholders' quote real-time investment decisions is a concrete cognizable harm. And there – That's the deterrence point that we were talking about. It's a variation, I think, on the deterrence point, Your Honor. And it's fundamental to our free market system. When shareholders like Saba have this record of buying and selling shares, they need to understand what their rights are when they're investing in these funds. Yeah, but standing is fundamental to our judicial system, so those are different. But anyway, so let's talk about personal jurisdiction and venues. So is it enough that the defendants just list their shares on the New York Stock Exchange? Your Honor, it is for purposes of actor transaction venue and for specific jurisdiction under New York law. So defendants blur two separate concepts here. And so just let me set the stage a little bit to make sure we're on the same page. They agree that their minimum contacts with the United States are sufficient to establish personal jurisdiction. So the only question then is whether we've sued in a permissible venue under the ICA, which they say is what's required to allow nationwide service of process. That's the only question. I mean it is true that there are some circuits who have this idea that if a statute authorizes nationwide service of process, that it's only in context with the whole country. But we haven't said that. So not specifically with respect to – I noticed your coset was saying that if you look at the statute, it just sort of says you have venue wherever you might otherwise bring a case. So it doesn't – that provision doesn't by itself expand the universal context. So I guess it's just another way of saying. So if, in fact, we didn't agree with that principle and we thought you needed to show personal jurisdiction or purposeful availment of New York, have you shown that here? Your Honor, the district court certainly found that we did based on – and that is – so just to make sure the two concepts are clear. The specific jurisdiction and actor transaction analysis is premised on the listing on the New York Stock Exchange and defendants' purposeful availment of the New York jurisdiction in that respect. And the fact that Sava's claims are – pertain to its rights as a shareholder, meaning they arise from the acquisition of shares on the New York Stock Exchange. The district court – this point was raised below, and the district court noted that defendants did not contest that Sava's purchase was on the New York Stock Exchange. I do want to make sure that we make – That means the mere listing of something on the New York Stock Exchange would impose any entity to personal jurisdiction in New York because they're selling something on the New York Stock Exchange? Your Honor, in the context of federal securities claims, that is a wholly unremarkable proposition. There is a reason that this court is the center of federal securities litigation because specifically with respect to actor transaction venue, any nontrivial act in furtherance of the wrong is sufficient to establish venue. But for venue, but that's not necessarily for personal jurisdiction. I apologize, Your Honor, if I've gone back, but I don't think there's disagreement that we are able to avail ourselves of nationwide service of process, provided we can establish venue in this district. And given the extraordinarily – So nationwide service of process is different from whether it comports with the due process limitations on personal jurisdiction, right? Yes, Your Honor, but again, I also don't think there is a dispute. In fact, I know there is not a dispute that defendants concede nationwide contacts are sufficient. My understanding of the argument I just heard was that they don't necessarily concede that that's the relevant analysis, just nationwide contacts. No. I think they do concede that. But then for venue, the dispute really is for venue purposes. Have we shown a transaction of business in SDNY or an actor transaction or purposeful availment under New York law? Okay, so what is the transacting business in SDNY? If they list on the stock exchange, will you buy the shares from a third party? So with respect to transacting business, and again, this is where it's important to distinguish the two concepts. For purposes of transacting business, they argue at this straw man. They try to say we're trying to claim the funds transact business merely by listing their shares on the New York Stock Exchange. That's not the argument. That's not what the district court found. For purposes of transacting business, the district court did exactly what this court instructed in Daniel, consistent with the Supreme Court's decision in Skofany, which is to undertake a realistic assessment of the ordinary nature of defendant's business. And the ordinary nature of defendant's business is to do nothing but buy and sell securities. Again, this is not about listing of their own securities. All they do is invest. They buy and sell securities and their own affidavits from their corporate representatives admit that they buy and sell those securities through brokers in New York. That is, there is nothing else to their business. And that was the basis on which the district court concluded there was a transaction of business in New York for purposes of venue. To the extent there's any doubt about that, I want to really make sure to point out that in the Dorchester decision cited by the district court, page 39 of the special appendix, note 11, any doubts about that? The affidavits and the pleadings need to be construed in the light most favorable to Saba and doubts resolved in Saba's favor for purposes of defendant's personal jurisdiction. We apply the presumptions of that jurisdiction that we apply to the merits. We make inferences in favor of the claimant and so on. But eventually, if it turns out that they don't transact business, you wouldn't deny that it would turn out that venue was improper. But the facts already establish that. Yes, we agree. Okay. Unless you have other questions. Mr. Musico, we'll turn to the first rebuttal. Mr. Mejia. Thank you, Your Honor. With respect to ECAT, I think the evidence is pretty clear. If you look at the Declaration of Trust, there is just a simple opt-out provision in the declaration. There's an exemption provision. But in terms of the first sentence, it's an opt-in, and they say we opt into the statute. What's pretty remarkable about it is actually the first sentence. It says, okay, we set up this rule that requires you to opt out. And then – but for companies' closed-end funds under the ICA, we're not going to apply that rule to them. We're going to change it into an opt-in. So isn't that like Maryland saying, look, we don't want to interfere with the ICA. We want to allow you to comply. I think what Maryland did in 2000 is it allowed the control share statute to apply to investment companies. So it was a recognition that investment companies would be bound by the Maryland control share statute. And in 2021, the boards decided in the exercise of fiduciary duties to adopt those features of the statute. It's not like Nuveen. It's not a bylaw where they lay it out. They basically say we are opting into the statute and all the features that come with the statute. What about Mr. Musico's argument that actually it doesn't define what the control share provisions look like? You have discretion to define them in all sorts of ways. With respect, we think it does. It basically says that you need a two-thirds shareholder vote to allow those shares to vote. That's the defining feature of the control share provisions. Okay, so because that is required by the law. Exactly. And so their words, their interpretation would read out the words otherwise. And overlaying all of this is the notion that state law is there to regulate takeovers. And this is a takeover. Make no mistake about it. And their interpretation is perhaps it's correct, perhaps it's not. But where there is a tie like that, Congress has said that preemption needs to be clear and manifest. And that most certainly is not what you see in 18I. You would need to have words that show that there's a clear intention to preempt state law. And that you don't see here. You have this word otherwise required by law. And when there's a tie under well-established preemption law, we win. Okay. I think we have that argument. Thank you, Mr. Lucia. Mr. Joyce. Thank you, Judge Monash. Let me start with a declaration, which for our purposes is essentially the same as the pleadings. Let's go to paragraph 27, right, the would acquire. I think you're right, Judge Monash, that it's got a conditional built into it. It hedges it off the bat. And even if it didn't, it's no different from Calcanum, what this court did on the pleadings. They're exact same thing. And this court said plaintiff's conclusory allegations of the factors we found relevant in this other ADA case, relevant to Article III standing in ADA cases, are insufficient to establish standing. So, too, here. They've just invoked the Nuveen factor without any facts around it. And if anything, I think the facts are better, as I said, in Calcanum. I have purchased in the past a gift card. And I would immediately do so again if you offered Braille gift cards. That feels much less speculative than talking about spending hundreds of millions of dollars. My friend, Mr. Musica, went to Faceorp. I think that's less conclusory than this is, right? We applied to NYU. We submitted articles to NYU. And we would do so again, but for this policy. The problem in that case was it wasn't clear that there were any individuals who actually did that. Here, you don't deny that there exists a SABA master capital fund, correct? Correct. But I think that goes to Judge Lee's questions about the pattern. And I think that takes us back to where Mr. Musica started at the very beginning. What he said was SABA's target is identical to that in Nuveen. Companies that have adopted control share provisions. That's not the target in Nuveen. SABA was an investor in Nuveen before it ever adopted a control share provision. In Royce, he's right. In 2021, Royce adopts a control share provision. SABA doesn't have any investments through 2022. Looks a lot worse than Faceorp. Looks a lot worse than my friends in Calcano. And then what happens? Oh, oral argument in Nuveen, June 14, 2023. Fifteen days later, they sue Royce. It's not anything like Nuveen. It's an entirely different case. And the facts aren't here to support Article 3 standing. The case should be dismissed on those grounds. Thank you very much, Mr. Joyce. Mr. Webb. Thank you, Your Honor. Stuart Webb on behalf of the Tortoise Funds and also speaking today for the Adams Funds and Rebuttal. I heard Mr. Musica argue that somehow we are transacting business in New York because we're listed on the New York Stock Exchange. The listing on the New York Stock Exchange has nothing to do with this case. The allegation that somehow- I think Mr. Musica said that you transact business in New York because your business is buying and selling securities. And you do that through a broker in New York. Okay, that's true. But what he started with was the buying and selling, not of securities for investment purposes, but by third parties of securities in the Tortoise Funds or the Adams Funds. That's what's done on the New York Stock Exchange. That has nothing to do with Tortoise or Adams. They're not involved in those transactions. I think one of the district court cases we cite, the Gilson case out of the Southern District of New York, says the listing on the Stock Exchange is no activity with regard to the issuing company. Well, it's some activity in terms of where you put your shares up for sale, right? We don't put the shares up for sale. You're participating in an exchange where they're purchased, right? We do- You can take it off the New York Stock Exchange, I guess. Is that true? We do list the shares on the New York Stock Exchange. That is true. But we're not participating in any transaction on those shares. What happens is you would have, which long before Tortoise ever- I mean, I saw they ever became a shareholder, you'd have an initial public offering. The underwriters purchase the shares. They then sell the shares to the initial group- So if somebody who purchases the shares wants to sue you over the terms you attach to the shares, where do they have to go? It depends on what their lawsuit is, I think, Your Honor. I mean, in some respects, they might have to go to Maryland or to Kansas, where there are exclusive forum provisions about suits regarding corporate governments. Okay. What about the argument of that venue that actually you transact business in New York because your business is buying and selling securities? Okay. The business there is the buying and selling of securities by the funds for themselves, not with regard to the shareholders. And there you've got the question of what's the record? There's no record evidence to support that. And I heard Mr. Musica said our own affidavits admit that we do that. If you look at the affidavits, and the affidavits are in the- Well, your affidavits admit that you are engaged in the business of buying and selling securities, right? Yes. And you have brokers in New York. No. You don't. Well, I don't know the answer to that. What I do know the answer to is if you read- But why are you buying and selling all the securities? It's largely done through decisions made by the Adams Fund in Maryland and by the Tortoise Funds. Okay. And when they make that decision, to whom do they communicate the instructions? They will use brokers, but we- And are there brokers in New York? There's nothing in the record on that, Your Honor. If you read the declarations, and if you read, for example, the declaration that was submitted on the Tortoise one- If the brokers were in New York, would that mean that you're transacting in business? Well, then what you get into, you look at the Sacophony case, and you look at the Kodak case, and they talk about you're looking at the ordinary business, everyday ordinary business of the funds, and the transaction of business, at least for purposes of the investment company, has to be of a substantial character. I submit that requiring something of a substantial character means you've got to assess the quality, quantity, and characteristics of that business. Well, I mean, if your business is buying and selling securities, and you might be making the decisions in Maryland, but you're on the phone transmitting those instructions to your broker in New York all day, isn't that a substantial part of your transaction? I don't think so. And that's the question, what is the business of one of these funds? I would submit that the business of the funds is the strategic management of an investment portfolio. It's the decision- That happens in Maryland. That happens for Adams in Maryland. It happens for Tortoise in Kansas. They've got their own traders there. And what the record doesn't show, and Daniel says, you need to do a realistic evaluation of the business of the defendant. And that was never done. And the problem you have here is SABA files a motion for summary judgment when it files the complaint. In the complaint, when I hear that their claim arises out of the shareholder rights, as you look at paragraph one of the complaint, paragraph one specifically says, if I can get my fingers working, this civil action, quote, arises from the fund's adoption of provisions in their governing documents, purporting to opt-in to the Control Share Act. The affidavits say that that was done by the boards in the Tortoise situation in Kansas and the Adams situation in Maryland. So the cause of action, they assert in the complaint, arises out of what's in Maryland. The issue about what the brokers do or don't do, there's nothing in the record that you can do. Do you have a view on the district court's reliance on the notion that when the statute authorizes nationwide service of process, that you can look at connections with the whole country? I think that's a good question, Your Honor, because what I look at with the Supreme Court decision in the state long-arm jurisdiction cases, the Supreme Court's basically cutting back on that and saying, you've got to have some real nexus between the claim, you ought to have general jurisdiction where they're at home, so that either the place of incorporation or headquarters, principal place of business, or if you're going to use specific jurisdiction, there's got to be some nexus. And that's what the venue provision does in connection with the nationwide service of process. It tries to put that connection in there in some way in the transacting of business. And the problem that you have here is that that was never analyzed, what business these funds did in New York for purposes of either venue or jurisdiction. And I heard that the inferences get drawn in favor of SABA in this, but they don't on summary judgment. And so it's always the burden of the plaintiff to establish the existence. It's their motion, you're saying. What? Because it's their motion. Well, it's their motion for summary judgment. It's one thing for Judge Rakoff to say on a motion to dismiss. I'm going to deny the motion because you get into this question of whether to get a prima facie case and how you draw inferences and you draw the inferences against a non-moving party. But on summary judgment, you draw the inferences in favor of us. So you can't take an affidavit that doesn't say something and draw an inference that does say that. Okay. I think we have that argument. Thank you very much. Thank you, Your Honor. Thank you very much. This is our last rebuttal, so the case is submitted. And because that is our last—